PAEZ, Circuit Judge,
joined by REINHARDT, Circuit Judge,
dissenting:
I respectfully dissent. I agree with the en banc panel majority’s conclusion in Part *545 111(A) that the Board of Immigration Appeals’s (“BIA”) decision in In re Briones, 24 I. & N. Dec. 355 (BIA 2007), is entitled to Chevron deference. I part company with the majority in its analysis of whether our holding to defer to Briones should be applied retroactively. The majority contends that, in light of the deference we owe agency decisions under National Cable & Telecommunications Association v. Brand X Internet Services, 545 U.S. 967, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005), “it is not clear whether we, as a judicial decisionmaker, have changed the law, or whether it is the agency that has changed the law.”[1] Maj. Op. at 514. I do not agree. I therefore dissent from the analysis and conclusions contained in Parts 111(B)(3) and (4) of the majority opinion.
Brand X makes it clear that an agency cannot overrule a judicial decision, and that a court’s first-in-time interpretation of an ambiguous statute is binding unless and until that court issues a judicial decision changing its rule of law in deference to an agency’s permissible, alternative interpretation. Brand X, 545 U.S. at 983-84, 125 S.Ct. 2688. It follows from this principle that, in deferring to Briones and overruling our holding in Acosta v. Gonzales, 439 F.3d 550 (9th Cir.2006), we have changed the law of this circuit. We are bound, therefore, to follow the constitutional principles applicable to Article III courts, including “the principle that litigants in similar situations should be treated the same, a fundamental component of stare decisis and the rule of law generally.” James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 537, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991). Indeed, the Supreme Court has admonished that “we can scarcely permit ‘the substantive law [to] shift and spring’ according to ‘the particular equities of [individual parties’] claims’ of actual reliance on an old rule and of harm from a retroactive application of the new rule.” Harper v. Va. Dep’t of Taxation, 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) (alterations in original) (quoting Beam, 501 U.S. at 543, 111 S.Ct. 2439 (Souter, J., concurring)).
The majority’s adoption of the retroactivity analysis we apply to an agency’s articulation of a new rule, see Montgomery Ward & Co. v. FTC, 691 F.2d 1322, 1328 (9th Cir.1982), violates these fundamental principles. In light of our recent decision in Nunez-Reyes v. Holder, 646 F.3d 684 (9th Cir.2011) (en banc), I would conclude that Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971) supplies the proper rule of decision. Applying the Chevron Oil test, I conclude that our holding today should apply purely prospectively.
I.
The Supreme Court explained in Brand X that Chevron deference is owed to an agency’s interpretation of an ambiguous statute that contradicts a court’s prior construction since agencies, not courts, fill “gaps” in the statutes they are charged with administering. 545 U.S. at 992, 125 S.Ct. 2688. Therefore, compelling agencies to follow judicial interpretations would “ ‘lead to the ossification of large portions of our statutory law,’ by precluding agencies from revising unwise judicial constructions of ambiguous statutes.” Id. (quoting United States v. Mead Corp., 533 U.S. 218, 247, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (Scalia, J., dissenting)). In response to the *546 dissent’s concern that the majority’s rule would allow agencies to effectively overrule judicial decisions, the Court cautioned that, where deference to an agency’s reasonable interpretation is not required,
the court’s prior ruling remains binding law.... The precedent has not been “reversed” by the agency, any more than a federal court’s interpretation of a State’s law can be said to have been “reversed” by a state court that adopts a conflicting (yet authoritative) interpretation of state law.
Id. at 983-84, 125 S.Ct. 2688 (emphasis added).
As the foregoing passage reveals, Brand X did not alter the fundamental balance of legislative and judicial power. It created nothing more than a new scenario wherein a court may, or sometimes must, change its prior rule of decision. Whether a court adopts a new rule because of revised views about the underlying law, because of intervening statutory changes, or because of its duty to decide in accord with Supreme Court precedent, its decision remains a judicial one. The same is true when a court overrules past precedent in deference to an agency.
II.
It is axiomatic that Article III vests judicial power in the federal courts, not in agencies, and that our decisions are therefore constrained by its dictates. The Supreme Court’s decisions in Harper and Beam elucidate the contours of this principle. In Beam, a Georgia distilling company brought a Commerce Clause challenge to an excise tax that distinguished between imported and local alcoholic products under the Commerce Clause. See 501 U.S. at 532, 111 S.Ct. 2439. The Supreme Court had previously sustained a Commerce Clause challenge to a substantially similar Hawaii statute in Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984). Id. The Supreme Court of Georgia agreed with the distillery that Bacchus established that the Georgia tax violated the Commerce Clause, but refused to apply Bacchus retroactively to afford the distillery relief. Id. at 533, 111 S.Ct. 2439. The Supreme Court granted certiorari to consider the question of whether a rule of law, once announced and applied to the parties to the controversy, must be given full retroactive effect by all courts adjudicating federal law. Id. at 534, 111 S.Ct. 2439.
Although the decision did not produce a unified opinion for the Court, a majority of Justices agreed that once a case has announced a rule of federal law and applied “that rule with respect to the litigants” before the court, no court may “refuse to apply [that] rule ... retroactively after the case announcing the rule has already done so.” Id. at 540, 111 S.Ct. 2439. In reaching this conclusion, the Court eschewed such “selective prospectivity” because it results in unequal treatment of similarly situated litigants, in violation of fundamental principles of judicial adjudication. Id. at 537-38, 111 S.Ct. 2439 (“[Selective prospectivity ... breaches the principle that litigants in similar situations should be treated the same.... ‘We depart from this basic judicial tradition when we simply pick and choose from among similarly situated defendants those who alone will receive the benefit of a ‘new’ rule of constitutional law.’ ”) (quoting Desist v. United States, 394 U.S. 244, 258-259, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting)) (additional citation omitted); see also id. at 540, 111 S.Ct. 2439 (noting that the “equality principle, that similarly situated litigants should be treated the same” in the criminal context “carries com *547 parable force in the civil context”).[2] For these reasons, the Court determined that “[t]he applicability of rules of law is not to be switched on and off according to individual hardship.” Id. Courts may, however, conduct a “generalized enquiry” into “the equitable and reliance interests of parties absent but similarly situated.” Id.
In Harper, faced with a similar retroactivity question,[3] the Court “adopt[ed] a rule that fairly reflect[ed] the position of a majority of Justices in Beam: When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or post-date our announcement of the rule.” 509 U.S. at 96, 113 S.Ct. 2510. The court rested its holding on a line of precedent affirming, in the criminal context,
two “basic norms of constitutional adjudication.” First ... that “the nature of judicial review” strips us of the quintessentially “legislative]” prerogative to make rules of law retroactive or prospective as we see fit. Second ... that “selective application of new rules violates the principle of treating similarly situated [parties] the same.”
Id. at 95, 113 S.Ct. 2510 (quoting Griffith v. Kentucky, 479 U.S. 314, 322-23, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)). In affirming Beam’s holding and extending this principle to the civil context, the court commented that its “approach to retroactivity heeds the admonition that ‘[t]he Court has no more constitutional authority in civil cases than in criminal cases ... to treat similarly situated litigants differently.’ ” Id. at 97, 113 S.Ct. 2510 (quoting Am. Trucking Ass’ns, Inc. v. Smith, 496 U.S. 167, 214, 110 S.Ct. 2323, 110 L.Ed.2d 148 (1990) (Stevens, J., dissenting)).
The Court’s holding limited Chevron Oil to the extent that state and lower federal courts had relied upon it to curtail the retroactive application of rules already applied to the parties to the case announcing the rule, in consideration of the particular equities of each case:
[0]ur decision today makes it clear that “the Chevron Oil test cannot determine the choice of law by relying on the equities of the particular case” and that the federal law applicable to a particular case does not turn on “whether [litigants] actually relied on [an] old rule [or] how they would suffer from retroactive application” of a new one.
Id. at 95 n. 8, 113 S.Ct. 2510 (quoting Beam, 501 U.S. at 543, 111 S.Ct. 2439 (Souter, J., concurring)).
III.
This precedent compels my conclusion that, as an Article III court, we should be guided by the fundamental principles of judicial adjudication. We may not weigh the retroactive effect of the rule we announce today in light of the equities of Mr. Garfias’s particular circumstances, nor may we consider his individual reliance on Acosta. To do so would be contrary to the nature of judicial review, which prohibits our selective application of rules that we *548 adopt, under Brand X deference or otherwise, to the parties before us based on our sympathies to particular litigants.[4] To do so would also no doubt threaten to encourage “replicative suits,” since parties who have yet to file may try their hand, in the hope that we would look more favorably upon their circumstances. Beam, 501 U.S. at 543, 111 S.Ct. 2439. Where equitable considerations play a role in our retroactivity analysis, therefore, we must conduct only a “generalized enquiry” into “the equitable and reliance interests of parties absent but similarly situated.” Id.
The rule of Montgomery Ward inherently involves — indeed requires — an individualized inquiry into the equitable and reliance interests of the litigants. See 691 F.2d at 1333 (stating that the third factor considers “the extent to which the party against whom the new rule is applied relied on the former rule” while the fourth factor considers “the degree of the burden which a retroactive order imposes on a party”). For this reason, it creates the anomalous result that similarly situated litigants will face different resolutions of their claims where some relied on the old rule of law to their detriment while others did not. Indeed, even the majority acknowledges the odd result that the Montgomery Ward rule creates. See Maj. Op. at 523 n. 13 (“We express no opinion whether other applicants may avoid the retroactive effect of Briones.”)[5]
But this is not the only reason that Montgomery Ward’s retroactivity analy-' sis appears inappropriate to the Brand X scenario. Montgomery Ward struck a delicate balance between an agency’s prerogative to develop and implement administrative policy through adjudication, and the need to protect litigants from the unfair surprise of applying a newly developed interpretation to their case. See 691 F.2d at 1328-29; see also Morales-Izquierdo v. Dep’t of Homeland Sec., 600 F.3d 1076, 1090 (9th Cir.2010) (“Montgomery Ward and its progeny deal with the problems of retroactivity created when an agency, acting in an adjudicative capacity, so alters an existing agency-promulgated rule that it deprives a regulated party of the advance notice necessary to conform its conduct to the rule.”) (citations omitted).
In Montgome'ry Ward, Wards department store challenged a Federal Trade Commission cease and desist order which found that it had failed to comply with a rule requiring that customers have ready access to written warranty information. 691 F.2d at 1324-26. In reviewing the Commission’s decision, the court first considered whether the order constituted an amendment of the rule, in which case the affected parties were entitled to adequate notice under the Administrative Procedure Act, or a mere adjudicatory restatement of the rule through application to unique facts. Id. at 1329. Having determined that certain portions of the order constituted a permissible interpretation of the rule, the court considered its retroactive effect. Id. at 1332.
*549 The court stated that its task, in adopting the five retroactivity factors the majority now seeks to import to Brand, X deference cases, was to “balanc[e] a regulated party’s interest in being able to rely on the terms of a rule as it is written, against an agency’s interest in retroactive application of an adjudicatory decision____” Id. at 1333. The agency contended that its interest in retroactive application stemmed from its “inherent authority to interpret rules” and that any limit on the retroactive application of a rule announced through adjudication would “vitiate[ ]” the agency’s essential policymaking function. Id. at 1334. In other words, the court sought to balance the agency’s need to engage in an evolving process of statutory interpretation against the harms wrought against individual litigants who attempted to comply with the agency’s rules, only to find that those rules were as-yet ill defined. See id. at 1328 (“ ‘Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order.’ ”) (quoting SEC v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)).
These same concerns simply do not inhere in a court’s decision to overrule past precedent applying Brand X deference. While an agency’s interpretive flexibility is essential to its policymaking functions, stare decisis ensures the stability of judicial rules and mandates that our interpretations of statutes do not evolve in each case via the same dialectic process. See Laborers’ Int’l Union of N. Am. v. Foster Wheeler Corp., 26 F.3d 375, 386 n. 8 (3d Cir.1994) (noting that the retroactivity rationales articled in Harper and Beam “do not apply analogously to administrative agency adjudications, primarily because the doctrine of stare decisis is far less rigorous in that.... [A]n agency boasts both judicial and legislative powers. When an agency exercises its legislative powers, neither the ‘cases’ or ‘controversies’ prerequisite, nor the rule of stare decisis, rears its head.”) (internal citations omitted); Dist. Lodge 64, Int’l Ass’n of Machinists and Aerospace Workers v. NLRB, 949 F.2d 441, 447 (D.C.Cir.1991) (noting that “Article III grounds” such as stare decisis and the principle that litigants in similar situation should be treated the same “are inapplicable to administrative adjudications”); see also NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 349, 73 S.Ct. 287, 97 L.Ed. 377 (1953) (“The constant process of trial and error, on a wider and fuller scale than a single adversary litigation permits, differentiates perhaps more than anything else the administrative from the judicial process.”).[6]
For these reasons, the Montgomery Ward framework is ill suited to resolving the retroactivity questions posed by Brand X deference.
*550 IV.
The proper rule of decision stems not from Montgomery Ward but from the three-factor test articulated in Chevron Oil. Although, as the majority notes, Chevron Oil’s continued validity has been questioned in light of Beam and Harper, we recently reaffirmed in Nunez-Reyes v. Holder, 646 F.3d 684 (9th Cir.2011) (en banc), that Chevron Oil retains full force and effect “(1) in a civil case; (2) when we announce a new rule of law, as distinct from applying a new rule that we or the Supreme Court previously announced; (3) and when the new rule does not concern our jurisdiction.” Id. at 691; see also id. at 691-92 (discussing cases that call Chevron Oil’s continuing validity into question). We must, of course, consistent with Beam and Harper, apply our rule of decision either purely prospectively or purely retroactively, and may not engage in the “selective prospectivity” that inheres in considering the equitable and reliance interests of individual litigants. See id. at 690.
Applying the Chevron Oil factors to the case at hand, I conclude that the rule of Briones, which we adopt today as the law of our circuit, should apply purely prospectively.
A.
“The three Chevron Oil factors are: (1) whether the decision ‘establishes] a new principle of law’; (2) ‘whether retrospective operation will further or retard [the rule’s] operation’ in light of its history, purpose, and effect; and (3) whether our decision ‘could produce substantial inequitable results if applied retroactively.’ ” Nunez-Reyes, 646 F.3d at 692 (quoting Chevron Oil, 404 U.S. at 106-07, 92 S.Ct. 349).
The first factor weighs against retroactivity. There is no question that we announce a new rule of law in overruling Acosta in deference to Briones. Nunez-Reyes, 646 F.3d at 692 (“There is no question that our decision today ‘establishes] a new principle of law ... by overruling clear past precedent on which litigants may have relied.’ Lujan-Armendariz [v. INS, 222 F.3d 728 (9th Cir.2000) ] clearly announced the rule that equal protection required that we treat expunged state drug convictions as we do expunged federal drug convictions. Just as clearly, we overrule that holding today.”) (quoting Chevron Oil, 404 U.S. at 106, 92 S.Ct. 349).[7] The majority acknowledges as much. See Maj. Op. at 515 (“In Acosta, we issued a binding interpretation of ambiguous provisions of the INA, which was authoritative in this circuit at least until the agency issued a reasonable interpretation to the contrary. If the agency had never done so, Acosta would still be good law.”).
The government argues that “there was no established practice or authoritative interpretation of the INA prior to Briones ” because Acosta constituted a “non-authoritative interpretation” of the interplay between §§ 212(a)(9)(C)(i)(I) and 245(i), and because, “[i]n light of Brand X, aliens were on notice that Acosta’s interpretation was not authoritative and could not have foreclosed Briones’s subsequent authoritative interpretation of the statutes.... ” Gov’t Supp. Br. at 23. As the majority discusses *551 in detail in Part 111(B)(2) of the opinion, these arguments are premised on the novel, and equally unsupported notion that judicial interpretations of ambiguous statutes are not an authoritative statement of the law where an agency with policymaking expertise has yet to issue its own interpretation. I agree with the majority’s detailed analysis rejecting this argument, and do not revisit it here. See Maj. Op. at 514-17.
Moreover, I find wholly unpersuasive the government’s contention that Brand X put undocumented immigrants on notice that Acosta might not be the law of this circuit at some point in the future. As the majority acknowledges, even the BIA “equivocated over whether, post -Briones, it would acquiesce in our decision in Acosta.” Maj. Op. at 516 (citing Briones, 24 I. & N. Dec. at 371 n. 9 (“We need not decide here whether to apply our holding in the Ninth and Tenth Circuits.”)). Given that the BIA itself was unclear about the legal landscape and the proper course to follow, it is unreasonable to presume that undocumented immigrants would foresee the decision that we reach today.
For these reasons, I conclude that our decision to overrule Acosta is a new rule of law and that this factor weighs against retroactivity.
B.
The second Chevron Oil factor is more ambiguous. We explained in Acosta that “[t]he statutory terms of § 245(i) clearly extend adjustment of status to aliens living in this country without legal status. This broad statement was based on a recognition that the statute’s purpose is to allow relatives of permanent residents to avoid separation from their loved ones.” 439 F.3d at 554 (internal quotation marks and citations omitted); see also id. at 555 (“[P]enalty-fee adjustment of status is intended to prevent the needless separation of families.”) (citation omitted). The BIA has concluded, by contrast, that § 245(i) was not intended to make adjustment of status available to recidivist offenders. See Briones, 24 I. & N. Dec. at 365-67. As the Supreme Court explained in Brand X, the BIA’s “decision to construe th[e] statute differently ... does not say that [our] holding was legally wrong. Instead, the [BIA] may ... choose a different construction, since the agency remains the authoritative interpreter (within the limits of reason)____” 545 U.S. at 983, 125 S.Ct. 2688.
In light of these two alternative, yet correct, interpretations of § 245(i)’s purpose, it is unclear whether retroactive application will further the rule’s operation. Nonetheless, because we owe deference to the BIA’s reasonable interpretation of § 245(i), I conclude that this factor weighs in favor of retroactivity.
C.
The third factor, like the first, weighs against retroactivity. Our precedent suggests that, in the usual case, where the first factor is met, so is the third, because inequity necessarily results from litigants’ reliance on a past rule of law. See Holt v. Shalala, 35 F.3d 376, 380-81 (9th Cir.1994) (finding the third Chevron Oil factor to be met “for the same reasons” as the first, since inequity would result from applying the new rule retroactively to the class of litigants who “reasonably relied on this Court’s previous rule”); see also Nunez-Reyes, 646 F.3d at 692-93 (discussing inequities resulting from the court’s abandonment of clear past precedent under the first Chevron Oil factor and stating that these inequities compel the conclusion that the third factor weighs against retroactivity since “[i]t would be manifestly unfair effectively to hoodwink aliens into waiving *552 their constitutional rights on the promise of no legal consequences and, then, to hold retroactively that their convictions actually carried with them the ‘particularly severe “penalty” ’ of removal”) (citation omitted).
More fundamentally, there is little question that our decision, if applied retroactively, could produce substantial inequitable results for the class of undocumented immigrants who applied for adjustment of status in reliance on Acosta. Deportation, particularly for an undocumented immigrant with a United States citizen spouse, is among the harshest of outcomes, rending families and threatening permanent separation from loved ones. Cf. Nunez-Reyes, 646 F.3d at 693 (“For those aliens who relied on Lujan-Armendariz, ... ‘[t]he potential for unfairness in the retroactive application’ of today’s decision ‘is significant and manifest.’ ”) (quoting INS v. St. Cyr, 533 U.S. 289, 323, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (alteration in original)). The Supreme Court has described deportation as a “harsh measure,” INS v. Cardoza-Fonseca, 480 U.S. 421, 448, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), that “may result in loss of ... all that makes life worth living.” Ng Fung Ho v. White, 259 U.S. 276, 284, 42 S.Ct. 492, 66 L.Ed. 938 (1922).
In our own circuit, we have held that the third Chevron Oil factor was met where a change in the statute of limitations would have barred the cause of action, Duncan v. Sw. Airlines, 838 F.2d 1504, 1507-08 & n. 4 (9th Cir.1987), where a change in the rules regarding preservation of issues for appeal would have deprived litigants of the right to appeal, United States v. Givens, 767 F.2d 574, 577-79 (9th Cir.), cert. denied, 474 U.S. 953, 106 S.Ct. 321, 88 L.Ed.2d 304 (1985), and where a change in the law would have expanded the scope of potential criminal liability, United States v. Goodheim, 651 F.2d 1294, 1297-98 (9th Cir.1981), abrogated on other grounds as recognized by United States v. Mulloy, 3 F.3d 1337, 1340 n. 2 (9th Cir.1993). Compare Gibson v. United States, 781 F.2d 1334, 1339 (9th Cir.1986) (“The final Chevron factor weighs dispositively against retroactive application, for it would yield substantial inequitable results to hold that the respondent slept on his rights at a time when he could not have known the time limitation that the law imposed upon him.”) (internal quotations and citation omitted), with Orozco v. United Air Lines, Inc., 887 F.2d 949, 953 (9th Cir.1989) (finding that substantial injustice would not result from application of de novo, rather than arbitrary and capricious, standard of review to plan administrator’s benefits determination, and therefore that the third Chevron Oil factor was not met). In my view, deportation, at a minimum, has a potential for injustice comparable to those events at issue in Duncan, Givens, and Goodheim.
For these reasons, I find that the third factor weighs decidedly against retroactivity.
D.
Balancing the factors, I conclude that the rule we adopt today should not apply retroactively. “The first criterion is the most important. It is ‘the threshold test for determining whether or not a decision should be applied nonretroactively.’ ” Jackson v. Bank of Haw., 902 F.2d 1385, 1390 (9th Cir.1990) (quoting United States v. Johnson, 457 U.S. 537, 550 n. 12, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982)). The third factor, likewise, appears from our precedent to carry great weight, on balance, in the court’s ultimate determination. See Int’l Ass’n of Machinists and Aerospace Workers v. Aloha Airlines, Inc., 790 F.2d 727, 736 (9th Cir.1986) (“Although the second Chevron Oil factor does favor retroac *553 tivity because it promotes the prompt resolution of labor disputes, the strength of the considerations relating to the first and third factors outweighs those relating to the second factor in this case.”); cf. NLRB v. Buckley Broad. Corp. of California, 891 F.2d 230, 234 (9th Cir.1989) (giving dispositive weight to the third factor, noting, “Buckley’s argument fails under the third factor. There is no possibility of an inequitable result from retroactive application of the Board’s new standard because the new standard works to Buckley’s advantage.”).
Our decision to overrule Acosta amounts to a complete reversal of a settled rule of law upon which a vulnerable class of litigants reasonably and detrimentally relied. The equities tip heavily in their favor, since those who sought adjustment of status in reliance on Acosta will face deportation if our rule applies retroactively. Though the second factor weighs in favor of retroactivity, in light of the strength of the first and third factors, I conclude that the rule of Briones should apply in this circuit purely prospectively.
Y.
For these reasons, I respectfully dissent. The rule of Chevron Oil, not Montgomery Ward, should ' govern our retroactivity analysis in Brand X deference cases. Applying that rule here, our decision should apply prospectively, and Garfias’s petition should be granted.[8]

. Judge Bybee's qualification of this statement, namely, that “it is not clear for purposes of determining which retroactivity analysis applies whether we or the agency effectively brought about the change in the law,” does not alter my view. Maj. Op. at 514 n. 7 (emphasis added).

. The Court also criticized the rule of selective prospectivity because it "would only serve to encourage the filing of replicative suits[.]” Id. at 543, 111 S.Ct. 2439.

. In Harper, the Supreme Court of Virginia refused to apply the Supreme Court's prior decision in Davis v. Michigan Department of Treasury, 489 U.S. 803, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989), to the parties before it, denying relief to retired federal employees seeking refunds for state income taxes. 509 U.S. at 90-92, 113 S.Ct. 2510. The Supreme Court granted certiorari and reversed.

. I am mindful that the Court in Beam and Harper addressed the weighing of equitable and reliance interests in a particular case in a different context, one in which a new rule of law had already been announced at the time its application to the litigants before the court was questioned. Nonetheless, Harper and Beam's recitation of the fundamental principles of judicial review cannot be lightly cast aside, and should, I believe, guide our choice of a retroactivity principle appropriate to the judicial decisionmaking we must engage in under Brand X deference.

. I have no doubt that judicious immigration attorneys will heed this thinly veiled invitation to attempt a different result.

. The majority's concession that the first Montgomery Ward factor "may not be ... well suited to the context of immigration law” underscores my conclusion. Maj. Op. at 521. As the majority explains, the first factor "arose in the litigation-intensive context of the NLRB regulating labor disputes between private parties” and "the NLRB is virtually unique among agencies in its long-standing reliance on adjudication’ and the common-law method.” Id. While the first Montgomery Ward factor indeed may not be well suited to the immigration law context, it is decidedly inapposite to the retroactivity concerns facing Article III courts. For this additional reason, therefore, I would not import the standard we apply to agency adjudication into our Brand X retroactivity analysis.

. Cf United States v. City of Spokane, 918 F.2d 84, 89 (9th Cir.1990) ("Our decision striking down this tax does not meet the tests of non-retroactivity. We overrule no precedent here and we do not decide an issue of first impression. As we have shown, our determination ... does not proceed from some obscure and half-formed idea only now wrested into the light of day. Rather, it proceeds from a long, if sometimes wavy, line of Supreme Court authority.”).

. Because I would grant the petition, I have no occasion to address the merits of Garfias’s challenge to the automatic termination of the BIA's grant of voluntary departure, addressed in Part III(C) of the majority opinion. Were I required to do so, I would agree with Judge Reinhardt’s conclusion that 8 C.F.R. § 1240.26(i) is not "a permissible exercise of the Attorney General’s authority to interpret the voluntary departure statute.” Reinhardt dissent at 539. I therefore join his dissent.